**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **ADVANCED MARKETING SYSTEMS, LLC** | § § § | |
| | § | **Case No. 6:15-cv-134-JRG-KNM** |
| **v.** | § | **LEAD CASE** |
| | § | **JURY TRIAL DEMANDED** |
| **CVS PHARMACY, INC.** | § | |
| | § | |

| | | |
|---|---|---|
| **ADVANCED MARKETING SYSTEMS, LLC** | § § | |
| | § | **Case No. 6:15-cv-137-JRG-KNM** |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **WALGREEN CO.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion construes the disputed claim terms of United States Patent Numbers 8,219,445 ("the '445 Patent"), 8,370,199 ("the '199 patent"), and 8,538,805 ("the '805 Patent") asserted in these consolidated actions by Plaintiff Advanced Marketing Systems, LLC ("AMS") against Defendants CVS Pharmacy, Inc. and Walgreen Co. (collectively, "Defendants").[1] On February 25, 2016, the parties presented oral argument on the terms at a *Markman* hearing. The Court **ADOPTS** the constructions set forth below.

Also before the Court is Defendants' Motion to Strike the Untimely Expert Declaration of Dr. Andrew Cromarty (Doc. No. 94). As explained below, Defendants' motion is **GRANTED**.

---

[1] AMS also sued Brookshire Grocery Company in consolidated Case No. 6:15-cv-138. The Court granted the parties' joint motion to dismiss the suit against Brookshire on March 29, 2016.

# BACKGROUND

The three asserted patents are related, and although their claims differ, they share the same specification.[2] The patents, entitled "Promotion Processor and Management System," are directed to a promotional vehicle for communicating discounts to customers and a system for processing those discounts when a customer presents the promotional vehicle at purchase. The Abstract of the '445 Patent states:

> A data processing system employs a unique coded promotional vehicle to attract customers into retail establishments for the purchase of discounted goods. The promotional vehicle includes coupon styled graphics integrated with a code to allow data tracking by the store pursuant to purchases by that customer. The promotional vehicle is easier and less costly to distribute compared to the prior art, avoids cutting of coupons, and post purchase redemptions. The system further allows more targeted discounting at a lower cost, and substantially reducing fraud by eliminating post purchase coupon processing and redemption. Additionally, the system provides for selective deactivation of the code for each discount used by redemption of the vehicle without deactivating the code for the discounts not used so that the code may remain selectively active for future use.

Claim 9 of the '445 Patent and Claim 15 of the '199 Patent are very similar and recite:[3]

> A [distributed] discount vehicle for use with a data processing system for tracking and processing a plurality of in-store discounts to potential purchasers of plural products during the checkout process, wherein said discounts are each associated with a specific one of said plural products, said discount vehicle comprising:
>
> two or more of said discounts including descriptive material to provide information at least identifying the products and their associated discounts, wherein said vehicle is associated with [exactly one] {a} select code that permits [machine reading and] tracking of said vehicle and of individual purchasers' purchased products and the prices thereof during checkout, said select code uniquely identifying all the discounts for all of the plural products associated with said vehicle [and reflecting at least one of varying discounts unique to a potential purchaser and identical discounts common to all potential purchasers], and said select code uniquely identifying said vehicle such that said select code can be selectively deactivated for only particular discounts, of the plurality of discounts,

---

[2] For convenience, citations in this Order will be made to the specification of the '445 Patent, but shall refer also to the corresponding portions of the specifications for the '199 and '805 Patents.

[3] Differing language between the claims is denoted by [brackets] for Claim 9 of the '445 Patent and {braces} for Claim 15 of the '199 Patent.

associated with the purchased products by redemption of the code associated with the vehicle such that the code remains active for future use with yet unused ones of the plurality of discounts associated with said plural products.

Claim 1 of the '805 Patent and Claim 28 of the '199 Patent are also similar to one another and recite:[4]

> A data processing system for tracking and processing a plurality of in-store discounts to potential purchasers of plural products during the checkout process, wherein said discounts are each associated with a specific one of said plural products, said system comprising:

> a discount vehicle, characterized by two or more of said discounts, including descriptive material to provide information at least identifying the products and their associated discounts;

> a customer account associated with a customer identification code, the customer account comprising two or more of said discounts of the discount vehicle selected by a customer to be associated with the customer account, the customer account being associated with a select code that permits tracking of said customer account during checkout, said select code uniquely identifying all the discounts for all of the plural products associated with the customer account;

> [wherein the customer identification code is inputted by the customer to access the customer account;]

> a checkout processing terminal including computer based tracking of individual purchasers' purchased products and the prices thereof, wherein said processing terminal includes a device for receiving the [select code] {customer identification code and the select code associated with the customer account} during checkout; and

> a data processor attached to said checkout terminal for receiving information regarding transactions associated with checkout, selected products and the discounts associated with the [select code] {code associated with the customer account} forming a part of the transactions, and processing said discounts in accord with said [select] code;

> wherein said data processor selectively deactivates the [select] code for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the [select] code associated with the customer account such that the [select] code remains active for future use with yet unused ones of the plurality of discounts associated with said plural products, said data processor being further connected to memory for storing data associated with said transaction.

---

[4] Differing language between the claims is denoted by [brackets] for Claim 1 of the '805 Patent and {braces} for Claim 28 of the '199 Patent.

# APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15. However, the doctrine of claim differentiation is not a "hard and fast rule," and courts cannot use the doctrine to broaden claims beyond their correct scope, determined in light of the intrinsic record and relevant

extrinsic evidence. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005); *see also Phillips*, 415 F.3d at 1312–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). Additionally, the well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing

through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted).

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

### Claim Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). A party challenging the definiteness of a claim must show it is invalid by clear and convincing

evidence. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007). The definiteness standard of 35 U.S.C. § 112, ¶ 2 requires that:

> [A] patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter."

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129–30 (2014) (internal citations omitted).

### Means-Plus-Function Limitations

Where a claim limitation is expressed in "means-plus-function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves two inquiries. The first step requires "a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the corresponding structure inquiry is not merely

whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

There is a rebuttable presumption that 35 U.S.C. § 112, ¶ 6 does not apply when the term "means" is not utilized. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348–1349 (Fed. Cir. 2015) (en banc) (holding that a presumption exists if the word "means" is not used, but overturning the prior standard that the presumption is "strong"). This presumption is rebuttable, however, because "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348 (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)). Thus, "[w]hen a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at 1349 (citing *Watts v. XL Systems, Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

## DISCUSSION

### I. Defendants' Motion to Strike Untimely Expert Declaration

As a preliminary matter, Defendants ask the Court to strike the expert declaration of Dr. Andrew Cromarty and its associated exhibits (Doc. Nos. 92-1 to 92-6), which AMS submitted in conjunction with its Opening Claim Construction Brief. Defendants contend that exclusion is warranted because AMS failed to timely disclose Dr. Cromarty's testimony as required by the Court's Local Patent Rules 4-2 and 4-3.

In its P.R. 4-2 disclosures, AMS indicated that it had "not yet determined if will introduce extrinsic evidence to support AMS' claim construction," but added that "it may use the

testimony of at least one expert witness and at least one percipient witness to support its claim construction." Doc. No. 94-1 at 2. Again in its P.R. 4-3 disclosures, AMS made the same generalized assertion that it had "not yet determined if will introduce extrinsic evidence to support AMS' claim construction," but that "it may use the testimony of at least one expert witness and at least one percipient witness to support its claim construction." Doc. No. 80 at 5, 10. AMS also indicated that it "may rely on the testimony of Frank A. Starvel and/or Andrew Cromarty in response and rebuttal to the evidence offered by Defendants' expert Abell (who was first identified in their November 12, 2015 Preliminary Claim Constructions)." *Id.* at 12. Then, with its Opening Claim Construction Brief, AMS for the first time disclosed Dr. Cromarty's declaration and two patents on which he relied in forming his opinions. Doc. Nos. 92-1, 92-4, 92-5.

AMS maintains that its late disclosure of Dr. Cromarty's testimony was not improper because his opinions are offered only to rebut "the erroneous constructions advocated by Dr. Abell." Doc. No. 98 at 5. It also contends that because Defendants were on notice of AMS's intention to use Dr. Cromarty's testimony in that capacity and because Defendants could have asked to depose him before the close of claim construction discovery, they should not now be permitted to challenge his opinions. AMS likens this situation to the one presented in *Phoenix Licensing, LLC v. AAA Life Ins. Co.*, No. 2:13-cv-1081-JRG-RSP, Doc. No. 430 (E.D. Tex. Apr. 6, 2015) (slip op.). There, the Court permitted one of the defendants to rely on a late-filed expert declaration for its claim construction arguments in part because it had given the plaintiffs notice of its intention to do so well in advance of claim construction briefing. *Id.* at 2–3. The Court also noted that the plaintiffs had been "accorded ample opportunity to depose [the] expert before the commencement of claim construction briefing process." *Id.* at 3. AMS concludes by asking the

Court for leave to supplement the claim construction record if it should determine that AMS's actions were improper.

The language of P.R. 4-2 requires the parties to provide at the same time they exchange Preliminary Claim Constructions "a preliminary identification of extrinsic evidence, including without limitation . . . **prior art**, and **testimony of percipient and expert witnesses** they contend support their respective claim constructions. . . . With respect to any such witness, . . . the parties shall also provide a **brief description of the substance of that witness' proposed testimony**." P.R. 4-2(b) (emphasis added). Similarly, P.R. 4-3 requires each party to identify "any extrinsic evidence known to the party on which it intends to rely either to support its proposed construction of the claim **or to oppose any other party's proposed construction** of the claim, including, but not limited to . . . **prior art**, and **testimony of percipient and expert witnesses**. P.R. 4-3(b) (emphasis added). It further requires the parties to provide on behalf of each of their experts "a summary of each opinion to be offered in sufficient detail to permit a meaningful deposition of that expert." P.R. 4-3(d).

Based on the circumstances presented, it is clear that AMS failed to comply with its obligations set forth in the rules discussed above. "Both the letter and the spirit of the Patent Rules require early and complete disclosure of extrinsic evidence relevant to claim construction." *Lodsys, LLC v. Brother Int'l Corp.*, No. 2:11-CV-90-JRG, 2013 WL 6442185, at *1 (E.D. Tex. Mar. 12, 2013). Under the rules, "[s]worn declarations of expert witnesses should be disclosed in the same manner as 'dictionary definitions, citations to learned treatises [or] prior art.'" *Id.* at *2 (quoting P.R. 4-2(b)). A party "may not merely drop a *hint* that it *may* use such a declaration to support its briefing." *Id.* This is precisely what AMS attempted to do here. AMS failed to identify Dr. Cromarty and the patents on which he relied in its P.R. 4-2 disclosures and also

failed to "provide a brief description of the substance of [Dr. Cromarty's] proposed testimony." P.R. 4-2. Further compounding the problem, AMS did not "clearly indicate in the [P.R. 4-3] Joint Claim Construction Chart and Prehearing Statement that it intend[ed] to rely on a sworn declaration; identify the declarant; and identify the precise disputed claim terms which [would] be addressed thereby." *Lodsys*, 2013 WL 6442185, at *2. Nor does the *Phoenix* case support AMS's position. In that instance, the Court noted that the defendant's late disclosure was justified because it was not a party to the action at the time the P.R. 4-2 disclosures became due. *Phoenix*, slip op. at 2. Indeed, the Court excluded the late-filed declaration as to all defendants who were parties to the action at that time. *Id.*

In sum, AMS's arguments do not justify its failure to disclose Dr. Cromarty's testimony before its Opening Claim Construction Brief. Additionally, AMS has not demonstrated that good cause exists to grant it leave to supplement the claim construction record. Consequently, Dr. Cromarty's declaration and its associated exhibits (Doc. Nos. 92-1 to 92-6) are hereby **STRICKEN**.

## II. Agreed Terms

At argument during the *Markman* hearing, the parties agreed to the following construction, which the Court hereby **ADOPTS**.

| Term | Agreed Construction |
|------|--------------------|
| "code" <br><br> ('445 Patent Claim 9, '199 Patent Claims 15 and 28, '805 Patent Claim 1) | "information that includes at least some machine-readable portion" |

*See* Doc. No. 104, *Markman* Hearing Transcript ("Tr."), at 54:8–55:22.

**III. Disputed Terms in the '445, '199, and '805 Patents**

    **a.** **"discount vehicle" ('445 Patent Claim 9; '199 Patent Claims 15 and 28; '805 Patent Claim 1);**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "discount vehicle" | "a discount vehicle comprising a printed publication, a website, or a mobile application" | "a paper-based article with a discount and a select code printed on it" |

The parties' primary dispute is whether a discount vehicle *may* take the form of a paper-based article or whether it necessarily *must* be paper-based. AMS contends that a discount vehicle can take the form of a printed publication, but may also be a website or mobile application. Doc. No. 92, AMS's Opening Brief, at 7 ("Open."). Defendants, on the other hand, maintain that in every instance, "the patents describe a discount vehicle as a sheet, card, or other form of paper that is distributed by mail or as an insert in newspapers or magazines." Doc. No. 96, Defendants' Responsive Brief, at 9–10 ("Resp."). The parties previously raised a similar disagreement in the context of Defendants' Motion for Judgment on the Pleadings, which led the Court to conclude that a decision regarding patentability under § 101 was best left until after claim construction. *See* Doc. No. 77 at 8–9. Having been fully briefed and argued, the issue is now ripe for resolution.

AMS argues that nothing in the claims or specifications of the asserted patents limits a discount vehicle to a paper-based article. Open. at 8–9. Rather, AMS contends that Defendants are improperly attempting to restrict the scope of the claims to several embodiments disclosed in the specifications. *Id.* at 9–10. According to AMS, the specifications describe a discount vehicle "as being a printed publication (such as a newspaper insert or flyer) or as being distributed 'by any other practical manner of distribution.'" *Id.* at 7 (citing '445 Patent 8:9–13, 8:22–24).

Further, AMS maintains that limitations appearing in the patents' dependent claims suggest that a discount vehicle should not be limited to a paper-based article. *Id.* at 9; Doc. No. 97, AMS's Reply Brief, at 6 ("Reply"). For example, AMS points out that several dependent claims are directed to paper-based discount vehicles, such as "a freestanding insert including a plurality of sheets," *see* '445 Patent at 12:4–8, or "a single sheet or card," *see id.* at 12:31–34. Conversely, other dependent claims indicate that a discount vehicle may be distributed by "a telecommunication system or electronic media," *see* '199 Patent at 12:65–67, by "electronic mail, or telephonic transmission," *see* '805 Patent at 12:5–7, or may "comprise[] a website," *see id.* at 12:8–9.

Defendants respond that AMS fails to define what a discount vehicle is, and instead, simply incorporates additional embodiments and limitations already present in the claims into its proposed construction. Resp. at 10. In support of their own construction, Defendants argue that "the specifications repeatedly and uniformly describe the [discount] vehicle as a paper-based article" or as "having features of a paper-based article." *Id.* at 10–11. Defendants also argue that during prosecution of the '445 patent, the patentee made statements indicating that he understood the discount vehicle to be paper based. *Id.* at 12–13; Tr. at 25:4–28:2. With regard to AMS's claim differentiation argument, Defendants maintain that claim differentiation is not a hard and fast rule of construction and is not helpful here because any presumption created by the doctrine of claim differentiation can be overcome by reference to the asserted patents' specifications and file histories. Resp. at 14–15. Finally, Defendants urge the Court to reject AMS's inclusion of a website or mobile application in its proposed construction because such a construction would raise questions of enablement under 35 U.S.C. § 112, ¶ 1. *Id.* at 16; Tr. at 31:3–33:1.

It is important to first note that AMS itself recognizes that one must look to the intrinsic record to find the meaning of discount vehicle. When asked at the hearing whether the term would have a plain and ordinary meaning to one of skill in the art, counsel for AMS responded, "I think as used in the context of the specification and claims, it has an obvious meaning."[5] Tr. at 16:13–15. Turning, then, to the intrinsic record, it becomes clear that the only meaning that can be properly ascribed to discount vehicle is "a paper-based article for communicating discounts to a customer." Throughout the specification, the patentee describes the discount vehicle as having features of a paper-based object. For example, the specification explains that the discount vehicle is printed ('455 Patent at 6:48–51, 6:60–61, 6:66–7:1, 7:6–8, 7:38–41, 8:29–32, 8:54–58, 9:22–23, 9:61–62, Figs. 1–2); may include folds or creases (*id.* at 5:66–6:4, 7:4–8, 7:31–36, 8:14–21, 9:53–56, Figs. 3A–C, 5A–D); may be perforated, torn, or otherwise separated in some way (*id.* at 7:50–52, 8:40–43, 9:45–50, 9:58–60, Figs. 3A–4A, 5A–D); can take a number of different shapes with multiple sides or portions (*id.* at 5:64–6:13, 8:15–22, 8:54–9:41, Figs. 5A–6B); and can be physically carried by a customer (*id.* at 7:12–15, 7:50–52, 8:40–43, 10:7–12, Figs. 3A–6B). Additionally, every embodiment taught by the specification takes the form of a paper-based article: "a single sheet of heavy grade paper" (*id.* at 5:66–6:13); "a stand-alone insert" into a periodical, mailer, or local supermarket circular (*id.* at 6:21–24); "a fold-out from a store sponsored circular inserted into a weekly village newspaper" (*id.* at 7:4–11); "a freestanding insert," which is "preferably placed in a newspaper for dissemination to potential customers" (*id.* at 7:30–58, 9:51–10:6); "a flat card (FC) . . . tak[ing] the form of [a] single sheet

---

[5] Although AMS contends in its briefing that discount vehicle would have meaning to one of ordinary skill in the art, its arguments are supported only by Dr. Cromarty's declaration and two prior art references attached thereto (the Barnett and Deatherage patents). *See* Open. at 7–8. Because these materials have been excluded as untimely, the only evidence properly before the Court to support AMS's proposed construction is the intrinsic record of the asserted patents. However, even if the Barnett and Deatherage patents had been taken into consideration, they do not further AMS's arguments, as neither patent uses the term "discount vehicle."

or card of any size or shape" (*id.* at 7:59–8:14); "a folded card (FLDC) . . . tak[ing] the form of a folded sheet or card of any size or shape" (*id.* at 8:15–48); and "a single sheet stock having two sides . . . for receiving printed information" (*id.* at 8:51-9:50).

AMS argues that discount vehicle cannot be limited to a paper-based article because the specification explains that a discount vehicle can "be distributed as a flyer, in a newspaper or other publication, or any other practical manner of distribution." Open. at 7 (citing '445 Patent at 8:9–13, 8:24–28). AMS contends that a person of ordinary skill in the art would understand that electronic forms of distribution, such as a website or mobile application, are other practical means of distributing a discount vehicle. *Id.* When properly read in context, however, the passage upon which AMS relies does not support its position. In full, the passage states:

> The FC [(flat card) or FLDC (folded card)] may be distributed as a mailer, and therefore include the name and address **470** of the customer and the postage **472**. While the FC [or FLDC] may most often be distributed by mail, it would be evident to one of ordinary skill that the FC [or FLDC] may be distributed as a flyer, in a newspaper or other publication, or any other practical manner of distribution.

'445 Patent at 8:7–13, 8:22–28. Thus, this portion of the specification refers to other practical means of distributing a flat card or a folded card—both of which are disclosed as being paper-based. *See id.* at 7:59–62, 8:15–22. Therefore, contrary to AMS's contention, the passage does not support the conclusion that a discount vehicle may be a website or mobile application.

The file history also suggests that discount vehicle should be limited to a paper-based article. For instance, in his Declaration in Support of a Petition to Make Special, the inventor of the asserted patents represented that the discount vehicle "includes printed material" for communicating information to the recipient of the vehicle. Doc. No. 96–10, Declaration in Support of Petition to Make Special ("Tai Decl."), at ¶¶ 1(B), 2(B). He also indicated that in order to receive a discount, a customer must physically deliver the discount vehicle to a sales

clerk when purchasing an item. *Id.* ¶¶ 7(B) ("The discounts are obtained by the presentation by the purchaser of a distributed discount vehicle to the sales clerk during check-out."), 8(B) (same), 21(B) ("The vehicle is provided to the customer prior to the point-of-sale, typically before the consumer enters the retailer's premises, so that the vehicle is brought by the customer to the retailer."). Finally, he repeatedly explained that the vehicle can be distributed by newspaper or direct mail. *Id.* ¶¶ 1(B), 2(B), 6(B), 9(B), 11(B), 12(B), 16(B), 17(B), 18(B), 19(B), 20(B), 23(B).

The claims themselves do not compel a different result. Although AMS argues that the inclusion of "a freestanding insert including a plurality of sheets" and "a single sheet or card" in dependent claims 10 and 17 of the '445 Patent requires the broadly-claimed discount vehicle of independent claim 9 to encompass methods of distribution other than paper-based articles, that is not necessarily the case. The specification makes clear that freestanding inserts and single sheets or cards are merely a subset of paper-based articles. *See* '445 Patent at 7:30–8:14. As such, a broader interpretation of discount vehicle could include other paper-based articles, such as flyers or foldouts in store-sponsored circulars, without running afoul of the doctrine of claim differentiation. *Id.* at 7:4–11, 8:9–13. In any event, the doctrine "is not a hard and fast rule of construction." *Seachange*, 413 F.3d at 1369. When appropriate, a presumption created by the doctrine must give way to a contrary construction dictated by the intrinsic record. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

Additionally, the dependent claims reciting distribution of a discount vehicle by "a telecommunication system or electronic media" or by "electronic mail, or telephonic transmission" do not teach as much as AMS proposes. Although AMS suggests that these claims are consistent with a discount vehicle in the form of a website or mobile application, they are

equally consistent with a paper-based article distributed by fax or email attachment. Finally, claim 3 of the '805 Patent, which recites a "discount vehicle compris[ing] a website," does not require a construction including a website or mobile application, as AMS contends. Nowhere in the specification does the patentee discuss implementing a discount vehicle using the internet, a website, a mobile application, or any other non-physical means. Accordingly, AMS's proposed construction gives rise to significant enablement questions under § 112, ¶ 1—questions that can be avoided by simply giving discount vehicle the narrower meaning clearly supported by the intrinsic record. *See Medtronic Navigation, Inc. v. BrainLab Medizinische Computersysteme GmbH*, 222 F. App'x 952, 956–57 (Fed. Cir. 2007); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). Furthermore, the probative value of claim 3 in determining the correct scope of discount vehicle is limited given that the '805 Patent was filed almost fifteen years after the priority date of the three asserted patents. *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009).

Overall, in view of the patentee's use of the term within the entire context of the intrinsic record, discount vehicle must be limited to a paper-based article. The Court is mindful that importing limitations from embodiments disclosed in the specification is generally inappropriate. *See Phillips*, 415 F.3d at 1323. But where, as here, a patentee repeatedly and consistently describes an aspect of the invention as being limited in a particular way, the construction adopted by the court must conform to that description. *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 559–60 (Fed. Cir. 2013). Finally, the Court rejects the additional limitations proposed by the parties. The discounts including descriptive material, the select code, and their relationships to the discount vehicle are adequately described elsewhere in the claims. The Court therefore

construes "discount vehicle" as "a paper-based article for communicating discounts to a customer."

b. **"discount" ('445 Patent Claim 9; '199 Patent Claims 15 and 28; '805 Patent Claim 1)**

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "discount" | No construction necessary. Plain and ordinary meaning.<br><br>Alternatively:<br><br>"a reduction in the price of one or more of said plural products" | "coupon" |

AMS argues that "discount" needs no construction because its meaning would be readily understood by one of ordinary skill in the art. Open. at 10. AMS contends that Defendants' proposed construction is overly narrow because "coupon" could be interpreted as the physical representation of a discount, which would be inconsistent with the term's usage within the specification. *Id.* AMS asserts that the specification sometimes refers to discounts as coupons, but in other instances, uses the term more generally to describe "a reduction in the price of a particular product." *Id.* Defendants counter that the specification uses coupon and discount interchangeably, and therefore, construing discount to mean coupon is proper. Resp. at 17 (citing *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F.3d 1367, 1380 (Fed. Cir. 2010)). Defendants maintain that the patentee also repeatedly used the two terms interchangeably during prosecution of the asserted patents. *Id.*

At the hearing, it became clear that Defendants are not only arguing that "discount" means "coupon," but also that a coupon must be paper based. *See* Tr. at 40:30–41:9. A review of the specification demonstrates, however, that Defendants' proposed construction is inconsistent

with the patents use of the term "discount." For example, in the vast majority of instances, the specification repeatedly uses the term to refer to a price reduction applied to particular products or the act of reducing a product's price. *See* '445 Patent at 4:11–14 ("It is a further object of the present invention to provide a data processing system programmed to track redemptions of a specialized multi-product incentive vehicle, so as to insure proper discounting against select products . . . ."), 6:38–40 ("[I]tems purchased that are subject to discount are tracked with the total amount charged to that customer adjusted accordingly."), 7:52–56 ("[T]he redemption vehicle includes sufficient information of all the discounted products to allow the customer to recognize these products and receive the discount at check-out."); *see also id.* at 4:53–55, 7:22–25, 7:33–36, 7:41–45, 10:20–23. And perhaps most tellingly, the patentee often uses the terms "coupon" and "discount" in close proximity, but uses them in such a way that the reader would understand the two terms to have different meanings. *Id.* at 2:9–14 ("[S]ales items were simply 'marked-down' or 'price-reduced' within the store with all consumers buying sale products during the sale period receiving the reduced pricing. These store-based discounts were in contrast to the manufacturer's coupons and, more popular with store owners."), 6:4–7 ("Within the various panels of the vehicle the discounts are prominently displayed with feature descriptors and the applicable discounts in the form of clipless coupons."); *see also id.* at 7:52–58, 8:3–7.

To be sure, the patentee sometimes substitutes the word "discount" for "coupon." *See id.* at 5:64–67, 6:34–37; *see also* Doc. No. 96-4, Patentee's Proposed Amendment ("Prop. Amend."), at 12 ("[T]here cannot be a code on any of the plural discounts (i.e. coupons) of a vehicle . . ."); *compare* '499 Patent at 5:19–21 ("FIG. 3*a* is a front vertically exploded view of a multi-coupon vehicle for use as a freestanding insert of a preferred embodiment of the present invention."), *with id.* at 7:30–31 ("Turning now to FIGS. 3*a-c*, one embodiment of the MDV

[multi-discount vehicle] is provided in the form of a freestanding insert."). On the whole, though, these instances are not enough to demonstrate that the patentee intended to assign a special meaning to the term "discount." *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning.") (internal quotation marks omitted). Accordingly, the Court rejects Defendants' proposed construction, and instead, construes "discount" to have its plain and ordinary meaning. Because this resolves the dispute between the parties, the term requires no further construction. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims.").

  c.  **"in-store discount" ('445 Patent Claim 9; '199 Patent Claims 15 and 28; '805 Patent Claim 1)**

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "in-store discount" | No construction necessary. Plain and ordinary meaning.<br><br>Alternatively:<br><br>"a reduction in the price of one or more of said plural products to be redeemed at a store or service establishment" | "coupons issued by a retailer as opposed to a manufacturer or other third party" |

  AMS argues that "in-store discount" needs no construction because one of ordinary skill in the art would readily understand the term to mean "a discount redeemed by a customer in a

retail store or service establishment." Open. at 12. Further, AMS argues that Defendants' proposed construction inserts limitations that are inconsistent with the specification and the term's plain and ordinary meaning—first, that an in-store discount must be a coupon, and also, that the coupon must be issued by a retailer and not a manufacturer. *Id.* Defendants respond that "[t]he asserted patents make a clear distinction between manufacturer-issued discounts/coupons and store-issued discounts/coupons." Resp. at 18. Defendants also contend that one of skill in the art would understand that in-store discounts are retailer-issued coupons because several pieces of prior art cited during prosecution of the asserted patents use the term "in-store coupons" to refer to coupons issued directly by a retailer. *Id.* at 19 (citing U.S. Patent Nos. 6,328,339 ("Dixon") and 5,822,735 ("De Lapa")). Finally, Defendants assert that the figures included in the specification of the asserted patents portray embodiments of retailer-issued coupons because they indicate that the discounts contained therein can only be redeemed at a particular retailer. *Id.* at 20.

To begin, inclusion of the term "coupon" as part of the definition of "in-store discount" is inappropriate; as stated above, nothing in the intrinsic record requires "discount" and "coupon" to be read synonymously. Similarly, the intrinsic record does not support the "issued by a retailer as opposed to a manufacturer" limitation urged by Defendants. Defendants have identified no evidence suggesting that the patent teaches that the claimed discount vehicle and data processing system would only be useful when dealing with retailer-issued discounts. To the contrary, the specification indicates that one of the objects of the invention was to reduce fraud associated with post-redemption processing of manufacturer-issued coupons. '445 Patent at 3:54–58; *see id.* at 3:4–39. A further object of the invention was to "avoid[] retailer in-store post redemption processing of coupons," *id.* at 3:54–56, which the specification describes as cumbersome for

retail store owners due to "the associated paperwork required in collecting, processing, and submitting coupons [to manufacturers] for reimbursement," *id.* at 3:18–23. Thus, in this context, the patentee used the phrase "in-store" to describe the location where coupon processing might occur. Defendants themselves acknowledge that the figures included in the specification similarly show only retailer locations at which the discounts may be *redeemed*, not necessarily that a particular retailer *issued* the discount. *See, e.g.*, *id.* ("Figure 3B of the asserted patents illustrate[s] a vehicle with a statement that the coupons are 'now available at these participating retailers,' and then lists the retailers [where] the coupons can be redeemed . . . ('STOP O,' 'SHOP O,' 'Big Y,' 'Shaw's').". Additionally, the fact that Figure 3B lists multiple retailers where a customer can use the discount vehicle suggests that an in-store discount should not be understood to mean that a particular retailer issued the discount.

The prior art patents Defendants rely upon are equally unhelpful to their position. First, neither of the patents uses the phrase "in-store discount"; instead, both patents discuss "in-store coupons." *See* Doc. No. 96-5, Dixon, at 8:1–10; Doc. No. 96–6, De Lapa, at 4:37–45. Therefore, they do little to inform how one of skill in the art would interpret the disputed term as it is used in the asserted patents. Furthermore, like the figures of the patents-in-suit, Dixon discusses only where an in-store coupon is *redeemed*, not by whom it is issued. *See* Dixon at 8:2–5 ("An in-store coupon is redeemed directly by the retailer or by a local entity such as a distributor in contrast with a national or regional coupon which is redeemed by a manufacturer."). Similarly, De Lapa teaches only that an in-store coupon is applied to a purchase made from the store. *See* De Lapa at 4:42–45 ("The system may also distribute 'in-store' coupons, providing discounts against total purchases from the store or a particular department."). Because Defendants have pointed to no evidence mandating that an in-store discount be issued by a retailer as opposed to a

manufacturer, the Court rejects Defendants' proposed construction. The term should have its plain and ordinary meaning. Having resolved the parties' dispute, no further construction is necessary. *U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362.

### d.   "during the checkout process" / "during checkout" ('445 Patent Claim 9; '199 Patent Claims 15 and 28; '805 Patent Claim 1)

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "during the checkout process"<br><br>"during checkout" | No construction necessary. Plain and ordinary meaning. | "during physical purchase of the products" |

AMS asserts that the "during checkout" terms should be given their plain and ordinary meaning because they would be clear to one of ordinary skill in the art. Open. at 13–14. AMS also asserts that a person of skill in the art would not understand the terms to be limited to only physical purchases, and nothing in the claims or specification supports limiting them in that way. *Id.* at 14. At the hearing, AMS argued that the plain and ordinary meaning of "during checkout" includes not only physical purchases, but also non-physical transactions, such as a phone or an online purchase. Tr. at 56:21–57:2, 62:3–17. Defendants counter that throughout the specification, the patentee describes the checkout process as being a physical transaction by indicating that the select code associated with the discount vehicle must be scanned. Resp. at 21–22. Defendants also point to the inventor's Declaration in Support of his Petition to Make Special and argue that the inventor indicated there that the discount vehicle must be presented to the merchant or to a sales clerk. *Id.* at 22.

Nothing in the claims themselves requires the checkout process to be limited to a physical transaction. Claim 9 of the '445 Patent recites:

> A distributed discount vehicle for use with a data processing system for tracking and processing a plurality of in-store discounts . . . during the checkout process, . . . wherein said vehicle is associated with exactly one select code that

permits machine reading and tracking of said vehicle and of individual purchasers' purchased products and the prices thereof during checkout . . . .

'445 Patent at 11:46–58; *see also* '199 Patent at 11:65–12:9 (Claim 15). Claim 28 of the '199 Patent and Claim 1 of the '805 Patent similarly embrace a data processing system for tracking and processing discounts during the checkout process, but also claim "a checkout processing terminal . . . [that] includes a device for receiving the customer identification code and the select code associated with the customer account during checkout." *See* '199 Patent at 13:1–24; '805 Patent at 10:53–11:10. As the term is used in the claims, "during checkout" could be read to involve either a physical or nonphysical purchase.

The specification lends itself to the same reading. *See* '445 Patent at 6:34–37 ("Customer 30, visits the Retail Store 40, armed with the multicoupon vehicle. During the checkout process, block 50, the multi-discount vehicle (MDV) is scanned and processed with that transaction."); *id.* at 7:15–18 ("At check-out, block 140, the customer purchases the items selected during the shopping visit, and the system scans both the vehicle code, and the customer membership card . . . ."). Further, the specification teaches the purchase of "services," which counsels against including the "during physical purchase of the products" limitation Defendants seek. *Id.* at 8:54–58. Many of the passages cited by Defendants in the inventor's declaration also do not necessarily exclude nonphysical purchases. *See, e.g.*, Tai Decl. at ¶ 1B ("The vehicle is presented by the customer to a participating merchant at check-out to obtain a discount on the select goods identified by the vehicle."). Defendants have identified only two passages in the declaration that arguably require checkout to be a physical transaction. *See id.* ¶¶ 7B ("The discounts are obtained by the presentation by the purchaser of a distributed discount vehicle to the sales clerk during check-out."), 8B (same). However, in both instances, the inventor is attempting to distinguish prior art systems that disclose situations in which a customer is physically interacting

with either a sales clerk or a product being purchased. Therefore, it is logical that the inventor might describe his invention in the physical context.

In sum, Defendants have not identified any language in the intrinsic record demonstrating that the patentee intended to act as a lexicographer or unambiguously limit the meaning of "during checkout" to something less than the term's plain and ordinary meaning. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). Accordingly, the term should not be limited to physical transactions. Because this resolves the parties' dispute, no further construction is necessary. *U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362. The terms "during the checkout process" and "during checkout" will be given their plain and ordinary meaning.

### e. "customer account" ('199 Patent Claim 28; '805 Patent Claim 1)

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "customer account" | No construction necessary. Plain and ordinary meaning. | Indefinite |

AMS asserts that "customer account" needs no construction because the term would be readily understandable to one of ordinary skill in the art. Open. at 27. AMS submits that the claims themselves adequately describe a customer account as: 1) being associated with a customer identification code; 2) comprising two or more discounts of the discount vehicle selected by a customer; and 3) being associated with a select code. *Id.* Defendants argue that "customer account" is indefinite because one of skill in the art would be unable to ascertain the scope of the term with reasonable certainty. *See* Resp. at 23 (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2128–29 (2014)). According to Defendants, because

"customer account" appears in an apparatus claim, it must correspond to some structural element. *See id.*; Doc. No. 96-11, Declaration of Peter B. Abell ("Abell Decl."), at ¶ 40. Here, though, Defendants contend that the patents fail to describe any structure when referring to the customer account. Resp. at 23–24. Indeed, Defendants assert that the specifications and file histories do not even discuss the customer account. *Id.* at 23. Defendants concede, however, that a customer account could refer to "a business relationship involving the exchange of money or credit," but nonetheless argue that such a relationship similarly fails to connote any structure. *Id.*; Abell Decl. ¶ 42.

AMS responds that a person of ordinary skill in the art would understand that in the context of the patents, a customer account is "a collection of data associated with a particular customer." Reply at 8. In support of this understanding, AMS notes that the specification indicates that "[r]etailers . . . have the capability to link transaction files of cardholders and build a database of the purchase behavior of their cardholder customers, thereby allowing the store to track buying patterns of its registered customers." '445 Patent at 2:66–3:3. AMS contends that "[r]egistered customers are customers with a customer account." Reply at 8.

Defendants cite no authority for the proposition that every term in an apparatus claim must correspond to some structural element in order to avoid an indefiniteness challenge under § 112, ¶ 2. They also fail to explain why the term, as it is used in the asserted patents, would be unclear to a person of ordinary skill in the art. The claims themselves explain that the customer account is associated with a customer identification code, discounts selected by the customer, and a select code that identifies the discounts selected and permits tracking of the customer account. *See* '199 Patent at 13:10–18; '805 Patent at 10:62–11:3. As AMS points out, the specification also recognizes that at the time of the invention, retailers commonly implemented

shopper loyalty programs using "Frequent Shopper Cards," which allowed the retailers to track a customer's purchasing habits and store information identifying the customer using a card code unique to that particular customer. *See* '445 Patent at 2:32–3:3. The specification's description of these shopper loyalty programs is also consistent with the common understanding of a customer account. Accordingly, the claims and specification would, with reasonable certainty, inform those skilled in the art of the scope of the invention because they indicate that the recited customer account can be used to monitor information related to a customer's interactions with a retailer. *See Nautilus,* 134 S. Ct. at 2124. No further construction is necessary. *See Georgia– Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884 (1958) ("If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more."). "Customer account" will be given its plain and ordinary meaning.

f. **"customer account being associated with a select code" ('199 Patent Claim 28; '805 Patent Claim 1)**

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "customer account being associated with a select code" | No construction necessary. Plain and ordinary meaning. | Indefinite |

Defendants first contend that "customer account being associated with a select code" is indefinite for the same reasons "customer account" standing alone is indefinite. Resp. at 25. Additionally, Defendants assert that one of skill in the art would not know with reasonable certainty how the select code and customer account are associated. *Id.*; Abell Decl. at ¶ 31. Defendants further argue that the term "associated with" as used in the context of the patents would have no established meaning to one of ordinary skill in the art. Resp. at 25; Abell Decl. at

¶ 25. They do, however, recognize that a relevant dictionary definition of "associate" is "to connect or join together; combine; link." Resp. at 25 (citing THE AMERICAN HERITAGE DICTIONARY 135 (2d ed. 1991)). Defendants argue that this definition would be unhelpful, though, to one of skill in the art because it is overly broad and does not establish, with reasonable certainty, the degree of association required by the claims. *Id.* AMS responds that because the claims and specification adequately describe the functional relationship between the customer account and the select code, the term is not indefinite and needs no construction. *See* Open. at 16. Further, AMS maintains that one of skill in the art would understand that there were many well-known ways to link the customer account and the select code in the prior art. *Id.*

As mentioned above, the claims indicate that the customer account and select code are, at a minimum, associated in such a way that the select code permits tracking of the customer account during checkout. *See* '199 Patent at 13:13–16; '805 Patent at 10:65–11:1. They also teach that the select code must identify discounts associated with the customer account that have been selected by a customer. *See* '199 Patent at 13:11–18; '805 Patent at 10:63–11:3. The specification also describes prior art systems involving codes "linked" to information identifying customers and their purchasing habits. *See* '445 Patent at 2:32–3:3, 7:1–20. The intrinsic record, therefore, provides meaningful guidance that would allow one of skill in the art to determine, with reasonable certainty, the scope of the disputed term. *See Nautilus,* 134 S. Ct. at 2124. Accordingly, this term is not indefinite and needs no further construction. *See Georgia-Pacific*, 258 F.2d at 136. The Court assigns the term its plain and ordinary meaning.

g. **"said select code uniquely identifying all the discounts for all of the plural products associated with said vehicle" ('445 Patent Claim 9; '199 Patent Claim 15); and**

**"said select code uniquely identifying all the discounts for all of the plural products associated with the customer account" ('805 Patent Claim 1); and**

**"said code uniquely identifying all the discounts for all of the plural products associated with the customer account" ('199 Patent Claim 28)[6]**

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "said select code uniquely identifying all the discounts for all of the plural products associated with said vehicle" | No construction necessary. Plain and ordinary meaning. | "The code is the only code that identifies all of the discounts for all of the products on the vehicle. The code cannot identify less than all of the products in the vehicle." |
| "said select code uniquely identifying all the discounts for all of the plural products associated with the customer account" | No construction necessary. Plain and ordinary meaning. | "The code is the only code that identifies all of the discounts for all of the products associated with the customer account. The code cannot identify less than all of the products associated with the customer account." |
| "said code uniquely identifying all the discounts for all of the plural products associated with the customer account" | No construction necessary. Plain and ordinary meaning. | "said code" is indefinite for lacking antecedent basis.<br><br>Remainder of the phrase means:<br><br>"The code is the only code that identifies all of the discounts for all of the products associated with the customer account. The code cannot identify less than all of the products associated with the customer account." |

---

[6] At the claim construction hearing, Defendants provided a slightly altered proposed construction than was included in their prehearing disclosures. For each of the proposed constructions, Defendants substituted the phrase "all of the discounts for all of the products" for the phrase "each of the discounts for all of the products." The amended proposed constructions are included in the chart above.

AMS argues that this term needs no construction because it would be readily understood by one of ordinary skill in the art. Open. at 20. AMS further maintains that Defendants' proposed construction is improper because it includes limitations not present in the claims themselves or in the specification. *Id.* at 20–21. Additionally, AMS asserts that the second sentence stating that "the code cannot identify less than all of the products in the vehicle [or, associated with the customer account]" is redundant because the claim language "already recites that the select code identifies *all* the discounts for *all* the products associated with the vehicle [or, the customer account]." *Id.* at 21.

Defendants contend that their proposed construction is consistent with the meaning the patentee ascribed to the term during prosecution when attempting to overcome the Dixon prior art reference. Resp. at 29. They note that in amending his application, the patentee stated that "the code cannot uniquely identify less than all of the products in the vehicle." *Id.* at 30 (citing Prop. Amend. at 12). Defendants also maintain that, as used in the claims, "said code uniquely identifying all the discounts" means that the code must be the *only* code that identifies all of the discounts. Tr. at 73:9–74:8, 75:1–11. Further, Defendants argue that Claim 28 of the '199 Patent is indefinite because "it is wholly unclear what code the claim is referring to when it recites 'said code uniquely identifying all the discounts for all of the plural products associated with the customer account.'" *Id.* at 28. In Defendants' view, "said code" could refer to either the "customer identification code" recited in the claim, or to the "select code." *Id.* Therefore, Defendants contend that the claim fails to inform those skilled in the art about the scope of the invention with reasonable certainty. *Id.* at 29.

At the hearing, Defendants' devoted much of their argument to their position that "unique" means that the code is "one of a kind." *See, e.g.*, Tr. at 73:14–18 ("So [the code] is

unique, meaning one of a kind. It is a one of a kind code that identifies all of the discounts for all of the plural products . . . . When you look at this claim language in isolation, you can tell that it is the code that is unique."). But looking to the claims, they do not say that the "*unique code identif*[ies]." Instead, they provide that the "code *uniquely identifies*." Thus, the claims themselves do not require that there must be only one code that identifies all of the relevant discounts.

The passages in the file history identified by Defendants similarly do not mandate inclusion of this limitation. For example, Defendants point to the patentee's statement in a proposed amendment that "the claimed distributed discount vehicle has exactly one select code uniquely identifying *all* the discounts *for all of the plural products* associated with the vehicle." Prop. Amend. at 10. This statement means just what it says: the discount vehicle has no more and no less than one select code. It does not necessarily mean that there can be no other codes that also identify all the discounts for all of the plural products associated with the vehicle. Defendants also point to the patentee's statement that "the code can only be on the vehicle," *id.* at 12, and argue "[i]f the code can only be on the vehicle, there can't be any other code, so it has to be the only code," Tr. at 75:6–7. Contrary to Defendants' assertion, this passage does nothing to inform whether the code is "one of a kind"; rather, it simply describes where the code must be located. Therefore, the first sentence of Defendants' proposed construction is inconsistent with both the claim language and the file history of the asserted patents.

The second sentence of Defendants' construction adds nothing to the claims that is not already present in the claim language itself. The claims clearly indicate that the select code uniquely identifies *all* the relevant discounts. An additional statement that "[t]he code cannot identify less than all" would be superfluous. Perhaps more concerning, however, the second

sentence of Defendants' proposed construction is inconsistent with the claim language stating that the select code identifies *discounts*, not products. *Compare, e.g.*, '445 Patent at 11:58–59 ("said code uniquely identifying all the discounts . . ."), *with* Def.'s Prop. Constr. ("[t]he code cannot identify less than all of the products . . ."). For these reasons, the Court rejects Defendants' proposed construction as unsupported by the intrinsic record.

Turning to Defendants' indefiniteness argument, the relevant portion of Claim 28 of the '199 Patent recites:

> a customer account associated with a customer identification code, the customer account comprising two or more of said discounts of the discount vehicle selected by a customer to be associated with the customer account, the customer account being associated with a select code that permits tracking of said customer account during checkout, said code uniquely identifying all the discounts for all of the plural products associated with the customer account

'199 Patent at 13:10–18. The fact that the claim uses the term "select code" in the clause immediately preceding "said code," whereas "customer identification code" appears much earlier in the claim, tends to indicate that "said code" refers to the select code. More importantly, though, the only code in the specification described as identifying discounts for products is the select code. *See* '445 Patent at 6:66–7:11. Similarly, claim 15 of the '199 Patent—which is directed to a discount vehicle for use with the claim 28 data processing system—explains that the "said vehicle is associated with a select code that permits tracking of said vehicle and of individual purchasers' purchased products and the prices thereof during checkout, said select code uniquely identifying all the discounts for all of the plural products associated with said vehicle." Although the claim 15 usage indicates that the select code identifies discounts for products associated with the vehicle rather than the customer account, taken together, these considerations would enable a person skilled in the art to determine, with reasonable certainty, that "said code" refers to the select code. Accordingly, this term is not indefinite. Having

resolved the parties' dispute, no further construction is necessary. *U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362. The term will be given its plain and ordinary meaning.

**h.** **"said select code can be selectively deactivated" ('445 Patent Claim 9; '199 Patent Claim 15); and**

**"selectively deactivates the code" ('199 Patent Claim 28); and**

**"selectively deactivates the select code" ('805 Patent Claim 1)**

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "said select code can be selectively deactivated"<br><br>"selectively deactivates the code"<br><br>"selectively deactivates the select code" | No construction necessary. Plain and ordinary meaning. | "ensuring that the select code cannot be used to obtain a product discount that was already obtained" |

AMS argues that this term also needs no construction because it would be readily understood by one of ordinary skill in the art. Open. at 24. AMS further argues that Defendants' proposed construction is improper because it includes limitations not present in the claims themselves or in the specification. *Id.* at 24–25. AMS maintains that the claim language is already clear, and thus, there is no need to paraphrase the language as Defendants propose. *Id.* Defendants respond that this term requires construction because it has no meaning to a person of skill in the art. Resp. at 33. According to Defendants, their construction is consistent with the specification's explanation that a "computer may thereafter deactivate the promotion for [a] product to insure that the MDV is not used again to duplicate the discount for the purchased items." *Id.* (citing '445 Patent at 10:23–26). They also note that during prosecution, the Board of Patent Appeals and Interferences recognized that "'selective deactivation' is accomplished by flagging data identifying the product to which a discount is being applied, and then updating the

records of the system in some manner to reflect that a discount was already obtained and is not to be applied again." *Id.* (citing Doc. No. 96-12 at 11).

Taken in context, the plain and ordinary meaning of this term would be clear to one skilled in the art. Claim 9 of the '445 Patent is representative and provides in relevant part:

> said select code can be selectively deactivated for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the code associated with the vehicle such that the code remains active for future use with yet unused ones of the plurality of discounts associated with said plural products.

'445 Patent at 11:64–12:3. Thus, the claim language itself provides an understandable explanation of what must occur in order for the select code to be "selectively deactivated." It sufficiently explains that only particular discounts of a number of discounts are deactivated and that the code remains active for unused discounts. The passage from the specification identified by Defendants simply elaborates on what is already stated in the claim language. In this instance, the claim language itself is the best explanation of the meaning of selective deactivation; there is no need to paraphrase the claim language as Defendants propose. Accordingly, the Court rejects Defendants' proposed construction, and instead, assigns the term its plain and ordinary meaning. Because this resolves the parties' dispute, no further construction is necessary. *U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362.

i.  **"said select code can be selectively deactivated for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the code associated with the vehicle" ('445 Patent Claim 9; '199 Patent Claim 15); and**

**"selectively deactivates the [select] code for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the [select] code associated with the customer account" ('199 Patent Claim 28; '805 Patent Claim 1)[7]**

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "said select code can be selectively deactivated for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the code associated with the vehicle" | "said select code can be selectively deactivated for only the discounts associated with the purchased products by redemption of the code associated with the vehicle, at checkout by a specifically programmed data processor, without deactivating discounts not associated with the purchased products" | "said select code can be selectively deactivated" should be construed as: <br><br> "ensuring that the select code cannot be used to obtain a product discount that was already obtained" <br><br> The remainder of the term does not require construction. |
| "selectively deactivates the [select] code for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the [select] code associated with the customer account" | "wherein a specifically programmed data processor selectively deactivates the code for only the discounts associated with the purchased products at checkout without deactivating discounts not associated with the purchased products." | Indefinite |

AMS urges the Court to adopt its proposed construction because a person of ordinary skill in the art would understand that selective deactivation would be performed at checkout by a retailer's specifically programmed data processor. Open. at 23. AMS contends that the specification discloses selective deactivation being performed by a specifically programmed data processor, and therefore, the proposed construction "would serve to improve the clarity of the asserted claims." *See id.* (citing '445 Patent at 10:15–28). Defendants counter that AMS's

---

[7] Differing language between the claims is denoted by [brackets] for Claim 1 of the '805 Patent.

construction is improper because it attempts to add limitations that have no basis in the claims or specification. Resp. at 31–32. Defendants note that the specification identifies only a generic computer and explains that the claimed system processes data using "existing scanning and data tracking protocols already in operation in the store environment" and "existing code software." *Id.* at 32 (citing '445 Patent at 4:63–67, 6:57–59). As such, Defendants argue that for claim 9 of the '445 Patent and claim 15 of the '199 Patent, "said select code can be selectively deactivated" should be construed consistent with their proposal for that term standing alone; they assert that the remainder of this disputed term needs no construction. *Id.* at 31. Defendants also contend that the disputed term as used in claim 1 of the '805 Patent is indefinite under § 112, ¶ 2 because a person of skill in the art would not understand (1) the scope of "customer account," or (2) the degree to which the select code and the customer account must be associated. *Id.*; *see supra* Sections III(e), (f). As to claim 28 of the '199 Patent, Defendants contend that the disputed term is indefinite for the same reasons and because it is unclear which code the claim refers to. Resp. at 31; *see supra* Sections III(e), (f), (g).

For the reasons explained previously, the disputed term is not indefinite. *See supra* Sections III(e), (f), and (g). Additionally, the Court rejects Defendants' proposed construction of claim 9 of the '445 Patent and claim 15 of the '199 Patent for the reasons set forth above in Section III(h). Turning, then, to AMS's proposed construction, nothing in the claims indicates that a specifically programmed data processor is required to perform the claimed selective deactivation. Claim 28 of the '199 Patent and claim 1 of the '805 Patent recite simply "a data processor" and "a data processing system." Similarly, claim 9 of the '445 Patent and claim 15 of the '199 Patent indicate that the discount vehicle is for use with "a data processing system." Additionally, the specification does not support AMS's position that a "specifically

programmed" limitation should be included in the construction of this term. The specification very generally references "a computer," '445 Patent at 10:13–26, and indicates that processing takes place using "existing scanning and data tracking protocols already in operation in the store environment" and "existing code software," *id.* at 4:63–67, 6:57–59.

Moreover, AMS has pointed to no language of lexicography or disavowal in the intrinsic record that would indicate that the meaning of "data processor" should be limited to something less than that term's full scope. *See GE Lighting Solutions*, 750 F.3d at 1309 ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term, and clearly express an intent to define the term.") (internal quotation marks omitted); *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009) ("A disclaimer must be clear and unmistakable . . . .") (internal quotation marks omitted). Although AMS contends that its proposed construction would clarify the claim language in dispute, claim construction is not an opportunity for a reviewing court to rewrite the patentee's claims. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). Instead, the court should "give effect to the terms chosen by the patentee." *Id.* Under these circumstances, AMS has not demonstrated that the term's plain and ordinary meaning should not apply. Accordingly, the Court also rejects AMS's proposed construction. Because this resolves the parties' dispute, no further construction is necessary. *U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362.

### j. "device for . . ." terms

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "device for receiving the customer identification code and the select code associated with the customer account during checkout"<br><br>('199 Patent Claim 28) | No construction necessary. Plain and ordinary meaning. | Means plus function term:<br><br>Function: "receiving the customer identification code and the select code associated with the customer account during checkout"<br><br>Structure: barcode scanner |
| "device for receiving the select code during checkout"<br><br>('805 Patent Claim 1) | No construction necessary. Plain and ordinary meaning. | Means plus function term:<br><br>Function: "receiving the select code during checkout"<br><br>Structure: barcode scanner |

Defendants contend that both of the "device for" terms are means-plus-function phrases that invoke § 112, ¶ 6 because the term "device" is "a nonce word that reflects nothing more than a verbal construct that is tantamount to using the word 'means.'" Resp. at 35 (citing *Williamson*, 792 F.3d at 1349–50). Defendants assert that the only structure disclosed in the specification for performing the claimed functions is a barcode scanner. *Id.* In its briefing, AMS responds that the disputed phrases should not be construed as means-plus-function terms because they do not use the word "means." Open. at 30. AMS maintains, though, that even if the disputed terms are governed by § 112, ¶ 6, the structure should not be limited to a barcode scanner. *Id.* Instead, AMS contends that the specification discloses that the structure could be a "checkout" where a user enters data. *See* Reply at 12 (citing '445 Patent at 6:44–46).

At the hearing, counsel for AMS failed to address whether these terms are even governed by § 112, ¶ 6; instead, he argued only that the structure for performing the identified functions

should not be limited to a barcode scanner. Tr. at 88:21–89:16. When asked by the Court, "Have you all conceded that [this is a means-plus-function term], and we are arguing about the structure now?", counsel responded, "I think that there is sufficient structure, and that is why I argued structure, so we don't dispute that." *Id.* at 90:7–14. It is unclear from counsel's statement if he meant that the phrase "device for" recites sufficiently definite structure to avoid § 112, ¶ 6, or whether he intended to concede that the phrase is a means-plus-function term. In any event, the distinction matters not because "device" is one of the terms that the Federal Circuit has indicated is typically used as a nonce word and does not connote sufficient structure to avoid § 112, ¶ 6. *See Williamson*, 792 F.3d at 1350 ("Generic terms such as "mechanism," "element," "device," and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word "means" because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6.") (internal quotation marks omitted). As in *Williamson*, "[h]ere, the word ['device'] does not provide any indication of structure because it sets forth the same black box recitation of structure for providing [a] specified function as if the term 'means' had been used." *Id.* Therefore, this limitation is subject to the provisions of § 112, ¶ 6.

The only structure disclosed in the specification corresponding to the identified functions is a barcode scanner. For example, the specification indicates that the discount vehicle "contains a bar code which may be scanned by a conventional bar code scanner," '445 Patent at 9:36–37, and that "[a]t check-out, the super market employs conventional scanning equipment to read both the MDV and the products selected by the customer for purchase," *id.* at 10:13–15. *See also id.* at 6:57–59 ("[P]rocessing [of the MDV and membership card] is accomplished via existing scanning and data tracking protocols already in operation in the store environment."). The

"checkout" AMS points to is taken out of context and does not refer to a means for receiving the select code. Instead, "checkout" as used in the passage refers to the checkout process. *Id.* at 6:35–37, 6:44–46 ("During the checkout process, block 50, the multi-discount vehicle (MDV) is scanned and processed with that transaction. . . . The entered and complete data set from checkout is sent to a remote/separate database . . . .").

For these reasons, the "device for . . ." limitations are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. The claimed function for Claim 28 of the '199 Patent is "receiving the customer identification code and the select code associated with the customer account during checkout," and for Claim 1 of the '805 Patent is "receiving the select code during checkout." The corresponding structure for both is a barcode scanner.

**k.** **"data processor for . . ." terms ('199 Patent Claim 28; '805 Patent Claim 1)**[8]

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "data processor . . . for receiving information regarding transactions associated with checkout, selected products and the discounts associated with the [select] code {associated with the customer account} forming a part of the transactions, and processing said discounts in accord with said [select] code; wherein said data processor selectively deactivates the [select] code for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the [select] code associated with the customer account such that the [select] code remains active for future use with yet unused ones of the plurality of discounts associated with said plural products" | No construction necessary. Plain and ordinary meaning. | Indefinite means plus function term: <br><br> Functions: <br> (1) "receiving information regarding transactions associated with checkout, selected products and the discounts associated with the [select] code {associated with the customer account} forming a part of the transactions" <br> (2) "processing discounts in accord with said [select] code" <br> (3) selectively deactivates the [select] code for only particular discounts, of the plurality of discounts, associated with the purchased products by redemption of the [select] code associated with the customer account such that the [select] code remains active for future use with yet unused ones of the plurality of discounts associated with said plural products" <br><br> Structure: no corresponding structure disclosed |

Defendants also contend that the "data processor for" terms are means-plus-function

phrases that invoke § 112, ¶ 6 because "[t]he format of these phrases is consistent with

traditional means-plus-function claim limitations, and would mean the same thing if 'a data

processor . . . for' is replaced with 'a processing means for.'" Resp. at 36 (citing *Williamson*, 792

---

[8] The language used in these two claims is very similar. Differing language between the claims is denoted by [brackets] for Claim 1 of the '805 Patent and {braces} for Claim 28 of the '199 Patent.

F.3d at 1350). Therefore, in Defendants' view, the "data processor for" terms do not connote sufficiently definite structure to avoid invoking § 112, ¶ 6. *Id.* As such, Defendants' argue that the specification must disclose structure in the form of an algorithm to correspond to the claimed functions, which Defendants contend the specification does not do. *Id.* at 36–37.

Relying on two cases previously decided in this District, AMS argues that the phrase "data processor for" is not governed by § 112, ¶ 6 because it would connote sufficiently definite structure to one of ordinary skill in the art. Open. at 31–32 (citing *Syncpoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-cv-247-JRG-RSP, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016) and *Smartflash LLC v. Apple Inc.*, 77 F. Supp. 3d 535, 539 (E.D. Tex. 2014), *reconsideration denied*, No. 6:13-cv-447-JRG-KNM, 2015 WL 4208754 (E.D. Tex. July 7, 2015)). AMS notes that in *Smartflash*, the court explained that "while 'processor' may not define a specific structure, it 'describes a class of structures.'" *Id.* at 32 (citing *Smartflash*, 77 F. Supp. 3d at 543). Additionally, AMS contends that because the asserted patents sufficiently describe the objectives and operations of the data processor, one of skill in the art would understand its structural arrangement. At the hearing, Defendants attempted to distinguish *Syncpoint* by arguing that there, the court was able to identify *operations* performed by the processor, whereas here, AMS has only pointed to *functions* of the data processor. Based on *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), Defendants argued that a "limitation's operation is more than just its function; it is how the function is achieved in the context of the invention." Tr. at 96:1–15; *see Apple*, 757 F.3d at 1299, *overruled-in-part on other grounds by Williamson*, 792 F.3d at 1349.

In *Williamson*, the Federal Circuit reiterated that the standard for determining if a term is governed by § 112, ¶ 6 is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." 792 F.3d

at 1349. The question is not whether "means for" can simply be substituted for the disputed term, as Defendants suggest. Because the claims at issue do not use the word "means," a rebuttable presumption arises that the disputed terms are not means-plus-function terms governed by § 112, ¶ 6. *See Williamson*, 792 F.3d at 1348. This presumption is supported by the fact that the term "processor" describes a class of structures, even if it does not define a specific structure.[9] *See Smartflash*, 77 F. Supp. 3d at 543; *see also Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374–75 (Fed. Cir. 2012) (finding that "height adjustment mechanism" designates "a class of structures that are generally understood to persons of skill in the art"); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) (finding that "detector" did not evoke particular structure but conveyed to one knowledgeable in the art the variety of structures known as "detectors").

As this Court recognized in *Smartflash*, "processer" "is not a generic nonstructural term such as 'means,' 'element,' and 'device' that typically do not connote sufficient structure." 77 F. Supp. 3d at 543; *see Williamson,* 792 F.3d at 1350. The claims at issue provide further evidence of structure by describing physical connections between the data processor and other claimed elements. *See, e.g.*, '199 Patent at 14:1–2 (reciting "a data processor attached to said checkout terminal for receiving information regarding transactions"); *id.* at 14:13–15 (reciting "said data processor being further connected to memory for storing data associated with said transaction"). And contrary to Defendants' assertion, the claims and specification describe *how* the data processor accomplishes the claimed functions. *See, e.g.*, '445 Patent at 10:13–29 (explaining that the data processor receives information from the checkout terminal after the select code is scanned); '199 Patent at 14:7–11 (explaining that the data processor processes discounts by

---

[9] Defendants agree that the construction of this term is not affected by the prefix "data" included in the disputed terms. *See* Tr. at 94:22–24.

selectively deactivating only particular discounts); *id.* at 14:11–15 (explaining that the data processor selectively deactivates discounts by deactivating particular discounts while leaving active other unused discounts). Based on these considerations, one of ordinary skill in the art would understand "data processor" to have a sufficiently definite meaning as the name for structure. *See Williamson*, 792 F.3d at 1349. Accordingly, the "data processor for" terms are not means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. *See Smartflash*, 77 F. Supp. 3d at 543; *Syncpoint*, 2016 WL 55118 at *21; *cf. Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) (holding that the term "circuit" connotes sufficient structure to avoid application of § 112, ¶ 6). Having resolved the parties' dispute, no further construction is necessary. *U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362. This term will be given its plain and ordinary meaning.

## CONCLUSION

For the foregoing reasons, the Court hereby **ADOPTS** the claim constructions set forth above. For ease of reference, the Court's constructions are stated in a table in Appendix A.

So ORDERED and SIGNED this 3rd day of May, 2016.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

## Appendix A

| Claim Term | Court's Construction |
|---|---|
| "discount vehicle" | "a paper-based article for communicating discounts to a customer" |
| "discount" | Plain and ordinary meaning |
| "in-store discount" | Plain and ordinary meaning |
| "during the checkout process" / "during checkout" | Plain and ordinary meaning |
| "customer account" | Plain and ordinary meaning |
| "customer account being associated with a select code" | Plain and ordinary meaning |
| "code" | AGREED: "information that includes at least some machine-readable portion" |
| "said [select] code uniquely identifying all the discounts for all of the plural products associated with [said vehicle / the customer account]" | Plain and ordinary meaning |
| "said select code can be selectively deactivated" / "selectively deactivates the [select] code" | Plain and ordinary meaning |
| "said select code can be selectively deactivated for only particular discounts . . . associated with the vehicle" / "selectively deactivates the [select] code for only particular discounts . . . associated with the customer account" | Plain and ordinary meaning |
| "device for . . ." ('199 Patent Claim 28) | Construed under 35 U.S.C. § 112, ¶ 6 <br><br> Function: "receiving the customer identification code and the select code associated with the customer account during checkout" <br><br> Structure: a barcode scanner |
| "device for . . ." ('805 Patent Claim 1) | Construed under 35 U.S.C. § 112, ¶ 6 <br><br> Function: "receiving the select code during checkout" <br><br> Structure: a barcode scanner |
| "data processor for . . ." terms | Not governed by 35 U.S.C. § 112, ¶ 6 <br><br> Plain and ordinary meaning |